The writ in this case was returned before me at Richmond Hill. As it presented a new question, I desired to have the aid of Judge Battle andJudge Manly at the hearing, and also the benefit of argument by counsel. For which purpose it was adjourned to this place (Raleigh). I regret that I have been disappointed. It becomes my duty to decide the case without the presence of the other judges, and without argument, except by Mr. Furches and Mr. Winston in behalf of the petitioner; so that I am not apprised of the ground on which the Governor rests his claim of authority.
The petitioner is exempted as a conscript by reason of a substitute, and is exempted from duty as a militiaman by force of the first section of the act of the last session of the Legislature, entitled "An act in *Page 353 
relation to the militia and a guard for home defense." Major Harbin sets out in his return to the writ, that he had the petitioner arrested under an order of the Adjutant General for the purpose of arresting conscripts and deserters, "as said Austin was a member of the Home Guard and liable to perform said duty." The order is in these words:
RALEIGH, 15 September, 1863.
Maj. A. A. Harbin will immediately call out the Home Guard of Davie County, and arrest every deserter or recusant conscript within said county, and deliver them to Colonel Mallett at Camp Holmes. If it be necessary, you can pursue said deserters beyond the limits of your county. Those citizens who aid, harbor, or maintain (545) deserters will be arrested and bound over to the courts to answer said charges. You will report to this office the manner in which this order has been executed.
By order of GOVERNOR VANCE: J. A. FOOTE, A. A. Gen.
The question presented by the petitioner and return is of great importance. On the one hand, if the Governor is authorized to require the Home Guard to perform the service of arresting deserters and conscripts, it will promote the efficiency of the Confederate Army; on the other hand, it will impose on citizens who, by the acts of Congress and the Legislature, are exempted from conscription and militia duty, a dangerous and irksome labor.
The subject must be considered by a judge "as a dry question of law," unaffected by collateral considerations growing out of the condition of our country, and for this reason, his conclusion may differ from that of those who are at liberty to look at it under the bias of feeling.
It is a part of the duty of a soldier of the Confederate Army to arrest deserters and recusant conscripts. The Governor of a State has certainly no authority to require a citizen, unconnected with any military organization, to perform this part of the duty of a Confederate soldier. Whether the Governor had authority to require a citizen belonging to the militia to perform this duty is a question which has not been decided. It may be conceded that the Legislature has power to give this authority to the Governor in respect to the militia, on the ground that they were liable to be called into service of the Confederate States, and might be required to do a part of the duty, as a compensation for not being called into service and required to do the whole duty of a Confederate soldier. But it is a question worthy of great consideration whether the Legislature has power to authorize the Governor to require this duty of citizens who do not belong to the militia, (546) *Page 354 
which is the only military organization, except enlisted soldiers, recognized by the Constitution. It is not necessary for the purposes of this case to decide the question, and it is referred to only for the sake of applying the rule, "Where a power has never been before exercised and is doubtful, the courts will not presume that it was the intention of the Legislature to assume it, but will require a clear expression of an intention to do so."
The matter, then, stands thus: The Governor has no authority to require a citizen who does not belong to the militia to perform this part of the duty of a Confederate soldier. Has the Legislature conferred the authority upon him? It is insisted that this is done by the act of the last session, entitled "An act in relation to the militia and a guard for home defense," which act and the act "to punish aiders and abettors of deserters" were ratified at the same time, 7 July, 1863, and are to be construed together. So the question depends upon the meaning and proper construction of these two statutes.
At the meeting of the Legislature two questions were pending: First, Congress in its wisdom having allowed substitution and many other exemptions from the conscription acts, was it in the power of the President, by calling upon the State for its quota of militia, to subject the persons so exempted as conscripts to military duty as militia? Second, had the Governor authority to require the militia to arrest conscripts and deserters from the Confederate Army? By the first section of the act "in relation to militia and a guard for the home defense," the first problem was solved, and it is enacted that all persons exempted as conscripts shall be likewise exempted from service as militia. By the third section of the act "to punish aiders and abettors of deserters," it is enacted that the Governor may require the militia to arrest deserters and (547) conscripts; thus solving the second problem, by authorizing the Governor to call out the remnant of the militia, that is, those not exempted from militia duty, to perform a part of the duty of Confederate soldiers, to wit, the officers of the militia and the men between 40 and 45 who had not then been called for as conscripts.
In order, however, to provide for home defense, the Legislature assumed the power of making State conscription. Whether the Legislature had the power to do so is a question into which it is not necessary to enter. The power is expressly assumed, and it does not become a coordinate branch of the State Government to decide upon it unless it be necessary to do so in order to dispose of a case before it. So it may be granted that the Legislature had power to organize for home defense a military body composed of the remnant of the militia, the exempts and persons over the age liable to militia duty. It is very certain that in doing so the intention was to make this new body wholly distinct and *Page 355 
different from the militia. Persons exempt from militia duty are included, new companies are formed, new officers appointed — in fact, everything is different; it is a new organization — a State conscription made for special purposes, "to be called out against invasions and to suppress insurrections" (section 6). And special care is taken to distinguish this new body from militia, for otherwise they might, under the Constitution, be called for by the Confederate States. Upon what ground, then, can it be insisted that the Governor is authorized to require this newly organized body and peculiar State institution to perform a part of the duty of Confederate soldiers? It is said the authority follows as a consequence of the military organization. I cannot see the force of the argument. In the act declaring the special purposes for which this new organization is made, no such authority is expressly given to the Governor. The power of the Legislature to confer it, even if such had been the intention, is by no means clear; and so we are not at liberty by implication to infer that such was the (548) intention, and the act "to punish aiders and abettors of deserters" puts the matter, as it seems to me, out of the range of discussion, by expresslyauthorizing the Governor to use the militia to arrest deserters and conscripts; thereby excluding, as plainly as words could do it, any authority to require such service of this new organization — the State conscripts, Home Guard. Expressio unius, exclusio alterius, is a well established rule of construction which the courts are not at liberty to disregard, and its soundness, when the object is to ascertain the intention of the Legislature, and neither to fall short of it nor go beyond it, is fully illustrated by this case. So the two statutes relied on as conferring the authority on the Governor actually exclude it by a double implication. In the first place, the act authorizes the Governor "to call out the Home Guard against invasions and suppress insurrections." Why was it not added, "and to arrest deserters and recusant conscripts," if such was the intention? That subject was present to the minds of the Legislature. In the second place, the act authorizes the Governor, in so many words, "to call out the militia to arrest deserters and conscripts." Why did it not add, and "also the Home Guard," if such was their intention? The conclusion that it was not the intention of the Legislature that the HomeGuard should be subject to thi [this] service is as clear as if the acts contained the words, "Provided, however, that the Governor shall not have authority to require the Home Guard to arrest deserters and conscripts," unless it be contended that the Governor has all power except such as is expressly prohibited — a position which I suppose no man will venture to assume.
The argument may be stated thus: The statute expressly authorizes the Governor to require "the militia," that is, the officers and men *Page 356 
(549) between 40 and 45, to arrest deserters. They form a part of the Home Guard. It follows that the Governor had no authority to require the whole body of the Home Guard to perform this duty; for if he had such authority, it was vain, idle, and superfluous to authorize him expressly to require a part to do that which he had authority to require of the whole. In this connection the provision, section 9, "The commissions of the officers of the militia shall be suspended only during the period of their service in the Home Guard," has an important bearing, the object being to preserve the organization of the militia, and to use them to arrest deserters; for which purpose the force was then adequate. The fact that, afterwards, the call for the men between 40 and 45, as conscripts, made the force inadequate, cannot change the meaning and proper construction of the statutes. If an amendment was thereby made necessary, the Legislature must make it; for neither the Governor nor the judges have authority to strain the law to meet the emergency.
I am aware of the responsibility under which I act. Jurisdiction is given to a single judge in vacation; my decision fixes the law until it is reversed by the Supreme Court or the law is amended by the Legislature; and I would not feel it to be my duty to stay the action of the Executive except upon the clearest conviction.
Whether, in the event the Governor should call out the Home Guard to repel a raid or suppress an insurrection, he would not, while the men were on this tour of service, which is limited to three months (sec. 6), have authority collaterally to require them to take up deserters and conscripts who might aid the enemy, is a question not now presented. We are confined to the naked question, Has the Governor authority to require the Home Guard to be called out for the mere purpose of arresting deserters and conscripts? The special order under which Major Harbin acted is for this purpose alone. It is true that the State was, before the passage of the acts, invaded, and the enemy was at that time, and (550) is now, within the limits of our State; but, as the order does not profess to be made for the purpose of repelling that invasion, there is no "tour of duty prescribed by the Governor not exceeding three months at any one time," according to the provisions of section 6. The time is unlimited, and the purpose is declared to be "to arrest every deserter and recusant conscript within the county of Davie, and deliver them to Colonel Mallett at Camp Holmes."
The suggestion that, as the arrest of deserters and conscripts would promote the efficiency of the Confederate Army, and thereby tend to defend the State against invasion, the authority of the Governor can be sustained on that ground, involves a latitude of construction unsupported by any principle of law, and, as it seems to me, cannot impress with much force the mind of any one who will read the two statutes *Page 357 
attentively and in connection. He will see, from the mode of defense contemplated by the Legislature in calling out the Home Guard for defense against invasion and insurrection, by regiments, battalions, and companies, on tours of duty within the State, not to exceed three months, etc., that the indirect and far-off mode of repelling the existing invasion, by arresting deserters and conscripts, was not in the mind of the Legislature, except when the Governor was authorized to use the militia for that purpose; which, according to the view I have taken above, excludes the conclusion that the Guard for Home Defense — the State conscripts — were to be used for that purpose also; for, if so, it was surely vain, idle, and superfluous to impose that service on the militia, who constituted but a small part of the guard for home defense.
The position was taken on the argument that the order under consideration clearly exceeds the Governor's authority, in this: It requires the guard for home defense "to arrest and bind over to the court, to answer said charges, those citizens who aid, harbor, and (551) maintain deserters," and is, therefore, void in toto. It is true, citizens who aid, etc., deserters, etc., although made liable to indictment by one of the statutes referred to, cannot, according to the Constitution and laws of the land, be arrested and bound over to court to answer the charges, by military authority; that can only be done by the civil authority, to wit, a warrant by a judge or justice of the peace, on probable cause shown on oath, and executed by the sheriff or constable. So it is clear that part of the order is void and against law. But it does not vitiate the other part of the order, provided the Governor had authority to make it.
It is thereupon considered by me that Richard M. Austin be forthwith discharged. *Page 359